# WENDELL A. HALL *v.* STATE OF MARYLAND

[No. 543, September Term, 1975.]

*Decided June 10, 1976.*

The cause was argued before MORTON, MELVIN and MASON, JJ.

*Lawrence J. Gebhardt, Assigned Public Defender,* with whom were *Gebhardt & Smith* on the brief, for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Joseph S. Lyons, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

The appellant went to trial in the Criminal Court of Baltimore (Karwacki, J., presiding) on an indictment charging murder and armed robbery. The jury returned a not guilty verdict on the murder charge, but guilty on the armed robbery charge. In this appeal it is first contended that the trial judge committed reversible error in denying appellant's motion for judgment of acquittal at the close of all the evidence.

The record indicates that as the victim and her eleven-year old son were leaving a shopping center in Baltimore City about 9:15 p.m. on October 18, 1974, the mother was attacked by two young men. In the course of the attack her purse was stolen and she was shot three times, resulting in her death. The son testified that the assailants were nineteen- or twenty-year old blacks, one of whom had his hair plaited in "cornrows." He observed them run down

Argonne Drive while he sought help. In a police line-up and at trial, the son was unable to identify the appellant as one of the assailants.

Another witness who lived next door to the appellant on Argonne Drive testified that during the evening of October 18, 1974, he was leaving his house and observed the appellant and an individual named Harris come down an alley. He stated that the appellant had a gun sticking out of one pocket and money out of another pocket. According to the witness, the appellant's hair was braided in cornrows. He was not sure whether the time was 9:15 p.m. or whether it could have been 8 o'clock.

On Sunday, October 20, 1974, appellant took a bus to the home of his aunt and uncle in North Carolina where, according to the testimony, he was to enter school the next day. The aunt testified that on the day following his arrival appellant told her that he had witnessed an attack on a woman in Baltimore the previous Friday night. He told her that prior to the attack an acquaintance named Maurice had stopped by appellant's home and when he went outside with Maurice, there were three other individuals. They then walked about two blocks where they encountered a woman and a little boy walking out of a shopping center. Maurice and one of the individuals grabbed the woman's pocketbook and when she resisted, the other individual shot and killed her. The appellant told his aunt that he had watched the attack from across the street and did not participate in it. He was told by the individual who fired the shots that he would kill the appellant "if he told." According to the aunt, appellant said that the gun had been thrown away in the area; that there was $4 and change in the pocketbook; and that each one got 50 cents, although appellant never stated specifically that he himself got 50 cents.

The appellant, his mother and one of his brothers testified that appellant was at home with his mother, three brothers and a sister during the entire evening of October 18, 1974. There was also testimony that the day following the shooting, the police questioned appellant with respect to the murder and robbery and he was then released. The next day

appellant's mother and step-father decided to send him to North Carolina to go to school. One week later the police advised appellant's parents that they wanted to question him further and the parents then had appellant sent back home. The police intercepted the bus he was traveling on in Washington, D. C., where they arrested the appellant and returned him to Baltimore.

In the course of appellant's testimony he admitted he had told his aunt in North Carolina that a woman in the neighborhood had been killed but denied giving his aunt the details she had testified to, telling the jury simply that he was not there and did not know who had done it.

In contending that it was error to deny his motion for judgment of acquittal, appellant asserts that the trial judge "erred by applying the wrong standard in determining the legal sufficiency of the evidence to sustain a conviction in that the trial court looked only to whether there was sufficient evidence from which the jury could *infer* guilt, rather than whether there was sufficient evidence from which the jury could find guilt *beyond a reasonable doubt*."

The record indicates that the trial judge, in response to appellant's motion at the conclusion of the state's case, announced:

> "THE COURT: I appreciate the argument, gentlemen. You have covered the points very well, and I can say I feel there is sufficient evidence from which a jury can infer guilt of the crimes charged in both indictments, and I will therefore deny the motion for judgment of acquittal for the reasons I have expressed in the course of my colloquy with counsel."

The motion was renewed at the close of all the evidence and summarily denied. While the state suggests that the issue is not preserved because the judge's remarks were addressed to the first motion and not the second, we think the issue should be met.

In appraising "a contention that the evidence was insufficient in law so as to preclude it from being submitted

to the jury, the test is whether the evidence either shows directly or supports a rational inference of the facts to be proved, from which the trier of fact could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged." *Williams and McClelland v. State,* 5 Md. App. 450, 459 (1968). *See also Metz v. State,* 9 Md. App. 15.

It is true, as appellant asserts, the trial judge did state in the course of his assessment of the evidence that "I feel there is sufficient evidence from which a jury could infer guilt of the crimes charged in both indictments * * *." We think, however, that his failure to recite the magic litany "guilt beyond a reasonable doubt" is not fatal. His failure to do so does not demonstrate, as appellant contends, that he employed the wrong standard in denying the motion for judgment of acquittal. The trial judge was an able, experienced judge and it is inconceivable that he was unaware that an accused's guilt "must be established beyond a reasonable doubt." *State v. Hutchinson,* 260 Md. 227 (1970). Any thought to the contrary is completely dispelled by looking at his instructions to the jury during which he advised the members:

> " * * * The burden of proof is upon the State to prove every element of the crime charged against the Defendant and he is presumed innocent until proven guilty beyond a reasonable doubt. * * * While the burden is on the State of establishing every fact material to the guilt of the Defendant, including every circumstance that enters into the crime charged beyond a reasonable doubt, that does not mean that the State must prove the Defendant guilty to an absolute or mathematical certainty. * * *

> "Guilt beyond a reasonable doubt may be based on direct evidence of the facts or it may be based on circumstantial evidence. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and

> common experiences. * * * For in either case, the
> jury must be convinced beyond a reasonable doubt
> of the guilt of the Defendant."

In any event, the ultimate question is "whether the State's evidence was, in fact, legally sufficient to permit the case to go to the jury." *Robinson v. State,* 20 Md. App. 450, 456 (1974). We think it was. There was the witness who, although equivocal on the exact time, saw the appellant on the evening of the crime with a gun sticking out of one pocket and money out of the other. There was the highly incriminating story the appellant related to his aunt upon his arrival in North Carolina. She testified that she could not have learned of the crime from the newspaper because "we don't get that paper." There was appellant's own concession that he told the aunt of the murder. There was his departure for North Carolina shortly after the crime. There was the testimony of the victim's young son that one of her assailants had a "cornrow" hair style, contradicted only by the testimony of the appellant that he had a "buckwheat" hair arrangement. "It has been consistently held that in order to overturn a judgment entered on the verdict of a jury for insufficiency of the evidence, it is necessary that there be no legally sufficient evidence or inferences drawable therefrom on which the jury could find a defendant guilty beyond a reasonable doubt. *Agresti v. State,* 2 Md. App. 278, 284 (1968). We cannot make that finding on the record before us.

It is next contended that the trial judge erred in permitting the state to inquire of appellant's mother about the results of a lie detector test given her and her husband thereby allegedly forcing appellant's trial counsel to object and leave the jury with the impression the results were unfavorable to appellant. The record indicates that the following colloquy took place during the state's cross-examination of the appellant's mother:

"BY MR. LYONS [Assistant State's Attorney]:

Q. Mrs. Price, you cooperated with the police? A. I did.

Q. You did whatever you could for them? A. I did.

Q. And as part of your cooperation, you even agreed to take a polygraphic examination, didn't you? A. Yes.

Q. Do you know what a polygraphic examination is? A. Yes, I do.

Q. And do you know the results of that examination? A. I know what they said.

MR. MITCHELL [Appellant's Attorney]: Objection.

THE COURT: Sustained. Mrs. Price, you don't have to answer the question.

BY MR. LYONS:

Q. Do you know also if your husband did take the polygraphic test? A. Yes, I do.

Q. Do you know the results of that? A. No. I don't.

MR. MITCHELL: Objection.

MR. LEE [Appellant's Attorney]: Objection.

THE COURT: Sustained."

We think the issue cannot be properly raised for the first time in this appeal. The questions with respect to the taking of the polygraph tests were not objected to at the time they were propounded and when an objection was interposed to the questions concerning the results of the tests, appellant's objections were sustained. Maryland Rule 1085. There was no request for a curative instruction or an admonition to the jury and, as it appears in the record, the trial judge accorded the appellant all that he asked.

It is next contended that the trial court "erred in permitting the State to inquire as to Appellant's alleged past criminal activity of which Appellant had not been convicted at the time of trial." The contention is based upon the state's cross-examination of appellant's step-father:

"Q. How was Wendall [appellant] doing in school?

A. He was doing good.

Q. He was doing well here?

A. Yes.

Q. Had Wendall been in any trouble here?

MR. MITCHELL: Objection.

MR. LEE: Objection.

THE COURT: Overruled.

BY MR. LYONS:

Q. Had Wendall been in any trouble here?

MR. MITCHELL: May we approach the bench?

THE COURT: You have made the point on your objection. No, you may not. I overrule your objection. You may answer the question.

BY MR. LYONS:

Q. Had Wendall been in any trouble here?

A. Yes.

Q. And what type trouble was that?

A. Him and another boy was picked up for collecting March of Dimes money.

Q. Were they also picked up for anything else? Was Wendall picked up for anything else?

MR. LEE: Objection, your Honor.

THE COURT: Overruled.

You may answer, sir.

A. Beg your pardon?

BY MR. LYONS:

Q. Was he also picked up for something else?

A. Yes.

Q. What else was that?

A. Some boys attacked a man and said that he was involved in some way.

Q. I see.

MR. LEE: We would object and move to strike, your Honor.

THE COURT: Denied."

It is, of course, well settled that evidence of an accused's prior arrest, indictment or criminal activity, not resulting in conviction, is ordinarily not admissible. *Arbaugh v. Director,* 27 Md. App. 662 (1975); *McLaughlin v. State,* 3 Md. App. 515, 524 (1967). In order, however properly to assess the contention appellant here makes, the questions propounded by the state on cross-examination and the answers elicited must be viewed in the context of the step-father's testimony on direct examination. The step-father had been asked by appellant's counsel why appellant was sent to North Carolina two days after the murder. The step-father stated that he and appellant's mother had discussed on several prior occasions the desirability of sending appellant to North Carolina for schooling, although conceding he was presently doing well in school here. The step-father further stated that on the Sunday morning after the Friday night murder and the appellant's questioning by the police on Saturday, he found a hunting knife on top of a cabinet in their home which appellant acknowledged to be his. According to the step-father, "I was upset by him having the knife and told him he was going to have to go to North Carolina * * *. I told him that he was going to pack his clothes. He was going on the next bus and the wife called the station to find out what time the next bus left and she put him on it." The purpose of this testimony, obviously, was to establish the reason appellant went to North Carolina and to allay any suspicion that the trip was made because of the murder and questioning of the appellant by the police. It was in this context that the trial court ruled on the above set forth questions by the state on cross-examination.

In discussing the principles of excluding prior criminal conduct, it is stated in *McCormick on Evidence,* ch. 17, § 157:

> "The rule is that the prosecution may not introduce evidence of other criminal acts of the accused unless the evidence is substantially relevant for some other purpose than to show a probability that he committed the crime on trial because he is a man of criminal character."

We think a fair reading of the challenged questions and answers demonstrates that the questions were not propounded for the purpose of showing a probability that appellant participated in the murder and robbery. Rather, they were asked in further exploration of the reason the appellant went to North Carolina shortly after the murder. In fact, the appellant concedes that the questions and answers "furthers, rather than weakens, the appellant's position" for they tended to show that "appellant's parents were having a supervisory problem with him and that this was the reason he was sent to North Carolina * * *." Moreover, the jury was advised, by way of stipulation, that the man the step-father said the appellant attacked had told the prosecutor that appellant was not the individual involved in the assault upon him. Under all the circumstances, we cannot find error in the trial judge's ruling on the challenged questions.

Finally, it is contended that the trial court "erred in permitting the State to use a statement of appellant given the police to cross-examine and impeach appellant when the State in response to appellant's discovery motion misled the appellant into believing that the State did not have or would not use any such statement."

The record indicates that in response to discovery procedures taken by appellant, pursuant to Maryland Rule 728, the state replied:

> "The Defendant made no oral or written statement to any agent or office of the State, in response to any question asked of him, following his arrest, which the State intends to introduce into evidence."

At trial, over appellant's protest, the state was permitted, in cross-examining appellant, to use a statement he had given to the police, shortly after his arrest, for the purpose of impeaching his testimony that he had never owned a gun. In the statement to the police, appellant admitted having previously owned or possessed handguns. One of the police officers who interrogated appellant was also permitted to testify in rebuttal concerning appellant's admission to

owning or possessing guns. Appellant's motions for a mistrial at the conclusion of the cross-examination and at the conclusion of the officer's testimony in rebuttal were denied.

When the prosecutor first apprised the court and appellant's counsel that he intended to use the statement given to the police by the appellant, counsel for appellant were permitted to read the statement which was in the form of handwritten notes taken by the officer during the interrogation. The prosecutor explained that he had permitted appellant's counsel to inspect the state's file but admitted "I did not show him everything * * *." Later on, the prosecutor stated to the court that "I was assuming in rebuttal or cross-examination that there would be a statement I could use."

The appellant concedes that there are no sanctions for the state's violation of Maryland Rule 728 (*Powell v. State*, 23 Md. App. 666 (1974)), but argues that "appellant's constitutional rights to effective assistance of counsel and due process of law" were violated by the state's "deceptive and misleading tactics * * *." While we certainly agree that the conduct of the prosecutor was anything but commendable, we cannot find, under all the circumstances, that there was such an invasion of appellant's rights to effective assistance of counsel and due process as to compel a reversal of his conviction.

*Judgment affirmed.*