629 A.2d 1239

**Hammel Jay CLARK, III a/k/a Hamel Joseph Clark**

**v.**

**STATE of Maryland.**

**No. 7, Sept. Term, 1993.**

Court of Appeals of Maryland.

Aug. 31, 1993.

Bradford C. Peabody, Asst. Public Defender (Stephen E. Harris, Public Defender, both on brief), Baltimore, for petitioner.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

CHASANOW, Judge.

Petitioner, Hammel Jay Clark, III, was tried in the Circuit Court for Baltimore City and was convicted by a jury of first degree rape, resisting arrest, and assault. The trial judge sentenced Clark to life imprisonment for the rape and to concurrent ten-year prison terms for resisting arrest and assault. The Court of Special Appeals affirmed the convictions in an unreported opinion. We granted Clark's petition for certiorari to consider whether, after a police witness volunteered at Clark's trial that Clark was "implicated as a suspect" in another rape case, the trial judge abused his discretion by refusing to allow Clark to show, from the same witness, that a DNA test had exonerated him in that other rape. 329 Md. 601, 620 A.2d 940.

## I.

On July 2, 1991, at about 1:00 a.m., Sherry Cheatems was riding home from work on a bus. During Cheatems' commute, Clark, who was also on the bus, attempted to engage her in conversation. Cheatems testified that she "was trying to tell him that [she] was not interested." However, at trial, a defense witness, Keith Nelson, testified that Clark "had his arm around her," and that he had observed the two "whispering in each other's ear goo goo laughing, goo goo eyes and necking and all that stuff." When Cheatems exited the bus near her home, Clark followed her. Cheatems testified that Clark grabbed her around the neck, dragged her into an alley off Monument Street, threatened to cut her throat, and then raped her.

After the alleged rape, Cheatems and Clark walked out of the alley together. Baltimore City Police Officer Robert Reason testified that he saw the pair walking down the street. According to the officer, Cheatems "appeared to [him] to be frightened and crying." He pulled over his patrol car, approached the two, and ordered Clark to step away from Cheatems so that he could question her. When Reason asked if Clark was bothering her, Cheatems replied that he had just

raped her. When Reason attempted to place Clark under arrest, Clark moved away from the officer. Believing Clark was trying to flee, the officer grabbed Clark and pushed him against the patrol car. After a brief scuffle, Reason placed Clark under arrest.

At trial, the State introduced DNA evidence which confirmed that Clark, in fact, had intercourse with Cheatems. Clark challenged the chain of custody of several items of clothing and specimens taken for the DNA analysis, and the judge informed the State that he would exclude several items of physical evidence unless the State produced the necessary witnesses to verify the contested chain of custody. In response, the State called Police Officer Robert Winder, a witness whom it had not anticipated calling and who therefore was not previously disclosed. Officer Winder testified that he had witnessed Clark's blood being drawn and had submitted the extracted samples to Evidence Control for DNA profiling. During cross-examination by Clark's attorney, Officer Winder indicated in the following colloquy that Clark was a suspect in another rape which occurred at a different location:

"[DEFENSE ATTORNEY]: And officer, what was your function in being there while this blood was drawn?

[OFFICER WINDER]: Recently I took a report on—

THE COURT: Officer, we have to hear you, the jury has to hear you. Please speak up.

[STATE'S ATTORNEY]: Your Honor, may we approach before the officer answers that?

THE COURT: Overruled. Go ahead, officer, tell her and answer the question loud and clear.

[OFFICER WINDER]: Okay. *Originally I answered to a call for a rape in the North Avenue, Curtin Avenue—area where a female reported that she was raped. And subsequently the suspect, Hammel Clark, was implicated as the suspect in this rape.*

[DEFENSE ATTORNEY]: And officer, are you aware that a DNA test indicated—

[STATE'S ATTORNEY]: Objection, Your Honor.

[DEFENSE ATTORNEY]: —that Mr. Clark—

[STATE'S ATTORNEY]: Objection.

THE COURT: Wait. Come up, please. (Counsel and defendant approached the Bench and the following ensued:)

\* \* \* \* \* \*

[DEFENSE ATTORNEY]: Your Honor, it has now been brought out this was an undisclosed—

THE COURT: What was your question?

[DEFENSE ATTORNEY]: *Is he aware that that case was closed as a result of a DNA test that excluded Mr. Clark?*

[STATE'S ATTORNEY]: Well, Your Honor—

[DEFENSE ATTORNEY]: Because he just indicated he was implicated in that.

[STATE'S ATTORNEY]: Well, he indicated that in response to her question. That's what I was trying to bring out.

THE COURT: Wait a minute. There was a DNA test done and what happened?

[STATE'S ATTORNEY]: Okay. He was arrested on two separate rape charges. Okay.

THE COURT: And the DNA was for the one we are not trying here.

[STATE'S ATTORNEY]: No, it was performed in both but they used one blood sample. This is the officer that drew his blood. He drew the blood for the first one because he was the officer who was on the first case.

\* \* \* \* \* \*

[DEFENSE ATTORNEY]: I proffer to the Court that what I was trying to elicit was what his function at the blood drawing was. My belief was that he would say something along the lines that he was a witness to blood drawing.

[STATE'S ATTORNEY]: Well, that is what he testified to.

\* \* \* \* \* \*

[DEFENSE ATTORNEY]: And he offered that he was there to another case. *I believe since he alluded to my*

*client being somehow involved in another case that it is highly prejudicial to the jury if I can't ask him what became of that case."* (Emphasis added).

The court then ordered defense counsel to "stay away from that other case." Clark contends that the trial judge erred by denying the defense an opportunity to present curative evidence countering Officer Winder's inadmissible and severely prejudicial testimony.

■ The State acknowledges that the officer's testimony informing the jury that Clark was "implicated as the suspect in this [other] rape" was not admissible. In Maryland, it has long been established that evidence of "an accused's prior arrest, indictment or criminal activity, not resulting in conviction" is inadmissible. *Hall v. State,* 32 Md.App. 49, 57, 358 A.2d 632, 636 (1976); *see also Arbaugh v. Director,* 27 Md. App. 662, 666–67, 341 A.2d 812, 815 (1975). There is also a general prohibition against admitting evidence of "other crimes" committed by the defendant. *Straughn v. State,* 297 Md. 329, 333, 465 A.2d 1166, 1168–69 (1983). Thus, "in a prosecution for a particular crime, evidence which in any manner shows or *tends to show* that the accused has committed another crime wholly independent of that for which he is on trial, even though it be a crime of the same type, is irrelevant and inadmissible." *Ross v. State,* 276 Md. 664, 669, 350 A.2d 680, 684 (1976) (emphasis added). While acknowledging, therefore, that Officer Winder's testimony would generally be inadmissible, the State seeks to justify the officer's injection of otherwise inadmissible evidence of Clark's prior rape arrest. The State argues that defense counsel somehow "opened the door" and invited the improper evidence of the prior rape charge when she asked Officer Winder about his "function" in obtaining Clark's bloodwork, thereby estopping Clark from complaining about its prejudicial impact. The State asserts that Clark should be precluded from correcting any damaging information his own cross-examination elicited. The State contends that the trial judge properly refused to allow further questioning of the witness to elicit testimony

which would have neutralized the officer's statement. In this case, that evidence would have disclosed that DNA evidence had completely eliminated him as a possible suspect in the other rape.

For reasons we will discuss below, we believe the State misconstrues the doctrine of "opening the door." Further, we believe that the doctrine has no application in this case. We do hold, however, that the doctrine of "curative admissibility," a doctrine frequently confused with "opening the door," does apply in this case. Under this doctrine, the trial judge should have allowed Clark to "cure" the inadmissible testimony of the police officer.

## II.

Because of the confusion engendered by some cases and some commentators, we begin with a discussion of the doctrines of "opening the door" and "curative admissibility." In his *Maryland Evidence Handbook,* Judge Joseph Murphy draws the important distinction between "opening the door" and "curative admissibility." Judge Murphy writes:

> "[E]arly cases recognize the important distinction between (1) the right to introduce evidence in response to (a) admissible evidence, or (b) inadmissible evidence admitted over objection (the doctrine of 'opening the door'); and (2) the prohibition against introducing evidence in response to inadmissible evidence admitted without objection (the doctrine of 'curative admissibility')."

Joseph F. Murphy, Jr., *Maryland Evidence Handbook* § 106(D), at 25 (1989) (hereinafter *Maryland Evidence Handbook* ).

### A. "Opening the Door"

■ The "opening the door" doctrine is really a rule of expanded relevancy [1] and authorizes admitting evidence which

---

1. Throughout this opinion, we have adopted the approach of Federal Rule of Evidence 401 and have collapsed the common law require-

otherwise would have been irrelevant in order to respond to (1) admissible evidence which generates an issue, or (2) inadmissible evidence admitted by the court over objection. Generally, "opening the door" is simply a contention that competent evidence which was previously irrelevant is now relevant through the opponent's admission of other evidence on the same issue.

One variant of the typical "open door" scenario, as noted above by Judge Murphy, is inadmissible evidence which is admitted over objection and which makes counter-evidence of the same character admissible. This version was suggested in *Lake Roland Ry. v. Weir,* 86 Md. 273, 37 A. 714 (1897), in which Judge Boyd discussed the principles behind "opening the door" to answer inadmissible evidence entered over objection:

"If after objection is made to testimony, the trial court admits it, the plainest principles of justice, to say nothing of consistency in the Court's rulings, would require that the other party be permitted to meet it. The ruling of the Court in the first instance determines it to be competent, and the party offering it should not be permitted to object to the other side contradicting or explaining it on the ground that it is incompetent, when the Court has held, at his instance, that evidence on that subject is admissible."

*Id.* at 277, 37 A. at 715–16.

In sum, "opening the door" is simply a way of saying: "My opponent has injected an issue into the case, and I ought to be able to introduce evidence on that issue." Two cases from this Court seem to have discussed this doctrine, *State v. Werner,* 302 Md. 550, 489 A.2d 1119 (1985) and *Washington v. State,* 293 Md. 465, 445 A.2d 684 (1982).

---

ments of relevancy (tendency to prove the existence or nonexistence of a proposition of fact) and materiality (tendency to establish a proposition that is of legal consequence to the determination of the issues in a case) into one term, *i.e.,* relevance. We believe that it is appropriate to condense these often confused concepts into a single term which covers both.

In *Washington,* an eyewitness testified at trial, implicating the defendant in a murder. During defense cross-examination, the witness acknowledged that she had previously failed to identify the defendant in a pretrial lineup. On the State's redirect, the witness, over defense objection, attributed this apparent inconsistency to anonymous threats she had received prior to the pretrial identification. The trial judge denied defense counsel's motion for a mistrial, and the jury subsequently convicted the defendant of second degree murder. This Court affirmed the conviction and held that evidence of anonymous threats *was* admissible, if only to rehabilitate the witness once the defense had raised the issue of her prior failure to identify the defendant. The Court observed that "[p]ermitting one side to impeach a witness by showing a prior inconsistency, and not permitting the other side to explain the inconsistency by such probative evidence, does not comport with even-handed administration of justice." *Washington,* 293 Md. at 471, 445 A.2d at 687. In other words, the cross-examination was admissible but it also "opened the door" to the witness's otherwise irrelevant explanation that although she had recognized Washington in the lineup, she did not identify him due to the. anonymous death threat she had received.

In *Werner,* the State tried to go through a door not yet opened. The alleged victim of multiple sexual offenses was asked on direct examination to explain her five-year lapse in bringing a complaint against her stepfather. Apparently attempting to preempt the defendant's attack on her credibility, the witness attributed her delay in reporting the sexual assaults to her recent discovery, years after the alleged assaults had ceased, that the defendant had also assaulted her younger sister. As in *Washington,* the Court held that this otherwise irrelevant evidence can become "admissible in a criminal case to rehabilitate a State's witness once the witness has been impeached in a substantial respect," but not before. *Werner,* 302 Md. at 560-61, 489 A.2d at 1124. Unlike *Washington,* however, the door in *Werner* was not yet opened. The State first introduced the irrelevant and inadmissible explanation

when no one had yet raised the issue of delay in reporting. The Court upheld the Court of Special Appeals' reversal of the conviction, but noted that if *defense* counsel had chosen during cross-examination to impeach the witness about her delay in reporting, then the State subsequently could have elicited the victim's otherwise inadmissible explanation that she had decided not to report the offense until she heard about her younger sister's similar complaint. *Id.* at 563, 489 A.2d at 1125.

We must emphasize that the "opening the door" rule has its limitations. For example, it does not allow injecting collateral issues into a case or introducing extrinsic evidence on collateral issues. Such evidence is also subject to exclusion where a court finds that the probative value of the otherwise inadmissible responsive evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *See* Fed.R.Evid. 403; *see also* Lynn McLain, *Maryland Evidence* § 403.1, at 297 (1987).

In the instant case, upon Officer Winder's blurting out that Clark was a suspect in another rape, defense counsel sought to introduce hearsay evidence of exculpatory DNA results. The "open door" doctrine is implicated when a party seeks to respond to the other party's evidence with either (1) evidence which is competent, or (2) evidence which is similar to the adversary's evidence which was ruled competent *over objection*. Clark's proffer extends beyond such rules of expanded relevancy. Defense counsel went further and inquired about the officer's knowledge of DNA results, *i.e.*, incompetent [2] *hearsay* evidence, to neutralize or rebut the officer's prejudicial testimony which was not objected to. Because the "open door" doctrine has no application here, the testimony

---

**2.** We shall use the term "incompetent evidence" to refer to evidence that is inadmissible for reasons other than relevancy. Examples of such "incompetent evidence" would be evidence that is inadmissible because of the hearsay prohibition, for lack of authentication, or because of the best evidence rule.

which Clark sought to elicit is admissible, if at all, only under the curative admissibility doctrine.

## B. "Curative Admissibility"

This Court has not previously had occasion to examine the doctrine of curative admissibility, although the Court of Special Appeals has, on several occasions, dealt with what it referred to as "curative admissibility." *See generally Savoy v. State,* 64 Md.App. 241, 494 A.2d 957 (1985); *Robinson v. State,* 53 Md.App. 297, 452 A.2d 1291 (1982).

Professor Wigmore apparently coined the phrase "curative admissibility." *See* 1 *Wigmore on Evidence* § 15 (3rd ed. 1940). This limited doctrine in rare instances allows otherwise irrelevant and incompetent evidence to repair the damage caused by previously admitted incompetent inadmissible evidence. In Wigmore's words, curative admissibility

"permit[s] rebuttal by means of otherwise inadmissible evidence only if the evidence originally submitted [by the opponent] created significant prejudice and there is a need for a corrective that the counterpuncher may provide by inadmissible evidence of his own." (Footnote omitted).

*Id.* at 741. Because of its narrow application, the rule of curative admissibility might better be called the "rule against curative admissibility" since the rule is more of a general prohibition against admissibility than a general rule in its favor.

A distinction between "opening the door" and "curative admissibility" is that generally the latter doctrine is more limited and applies where a party wishes to offer incompetent evidence in response to incompetent evidence offered by the opponent which was admitted *without objection;* had there been an objection which was overruled, the trial court has effectively made the identical evidence admissible and the only issue is relevancy, thus the "opening the door" rule of expanded relevancy, discussed above, would control.

That the curative admissibility doctrine is not frequently invoked is evidenced by the fact that the much more familiar

way to "cure" inadmissible evidence admitted without timely objection is to appeal to the court's discretion to grant a belated motion to strike the evidence and to deliver a curative instruction to the jury to disregard the inadmissible testimony. However, where merely striking out the irrelevant evidence is not sufficient to erase the prejudice it caused, and the "damage in the form of prejudice to the defendant transcend[s] the curative effect of the instruction," *Kosmas v. State*, 316 Md. 587, 594, 560 A.2d 1137, 1141 (1989), the damaged party may seek to counter the prejudice with otherwise irrelevant *and* incompetent evidence. In that case, the "open door" doctrine of expanded relevancy offers the damaged party no recourse. But, in limited circumstances, when inadmissible and highly prejudicial evidence has been admitted without objection and the opposing party wishes to offer inadmissible evidence that would go no further than neutralize the previously introduced inadmissible evidence, the trial judge has discretion to permit "curative admissibility."

In recognizing this limited opportunity, we are at least modifying language in a 140–year old holding. One of the central issues in *Baltimore & Susquehanna R.R. Co. v. Woodruff*, 4 Md. 242 (1853), a railroad negligence case, was whether the defendant railroad started the fire on the plaintiff's property. After the railroad gave testimony at trial attesting to its diligent maintenance of its engines, the judge permitted the property owner to offer rebuttal hearsay evidence of other fires that the plaintiff's railway cars started on neighboring lots. This Court noted in *dicta* that even if the railroad's evidence of due care was overly "loose and indefinite as to render it illegal," the rebuttal evidence of other fires would still be improper. *Id.* at 255. The Court stated, " 'the offering [of] improper evidence by one of the litigant parties, *never can justify the introduction of similar evidence by the other party;* such doctrine would lead to endless confusion, and destroy all the established rules of evidence.' " *Id.* (quoting *Walkup v. Pratt*, 5 H. & J. 56) (emphasis added). We agree that the "curative admissibility" doctrine had no proper place in *Woodruff.* In that case, the initial evidence of diligent

engine maintenance was not inadmissible prejudicial evidence, and the rebuttal evidence of prior unrelated fires went far beyond merely neutralizing the diligent maintenance testimony; it also tended to establish that the railroad caused the fire on the plaintiff's land. Thus, while we may agree with the Court's rejection of the doctrine under the particular facts of *Woodruff*, we cannot accept the Court's broad prohibition against "curative" evidence.

■ While we are willing to recognize, in limited contexts, the remedy of curative admissibility, we do not wish to stray unnecessarily far from this Court's traditional disfavor of the doctrine. As now-Chief Judge Wilner observed for the Court of Special Appeals, "[e]ven when applicable, [curative admissibility] must be used with great caution." *Robinson*, 53 Md. App. at 306, 452 A.2d at 1296. We emphasize that the curative evidence must go no further than neutralize the previously admitted evidence and place the offering party in the same trial posture it was in before the inadmissible evidence was introduced. As the District of Columbia Circuit stated in *United States v. Winston*, 447 F.2d 1236 (D.C.Cir. 1971),

> "[t]he doctrine is to prevent prejudice and is not to be subverted into a rule for injection of prejudice. Introduction of otherwise inadmissible evidence under shield of this doctrine is permitted 'only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence.'"

*Id.* at 1240 (quoting *California Ins. Co. v. Allen*, 235 F.2d 178, 180 (5th Cir.1956)).

■ We hold that a trial judge has discretion to permit curative admissibility of inadmissible evidence to counter other inadmissible evidence admitted without objection where:

(1) prejudicial inadmissible evidence was admitted without timely objection or timely motion to strike;

(2) the failure to object or move to strike was not shown to be an intentional or tactical decision in order to admit the "curative evidence";

(3) the inadmissible evidence is highly prejudicial and a motion to strike the previously admitted evidence and a cautionary instruction would not cure its prejudicial effect;

(4) the "curative" inadmissible evidence goes no further than neutralizing previously admitted inadmissible prejudicial evidence without injecting additional issues in the case and does not allow the curing party to gain a tactical advantage from the failure to object to inadmissible evidence;

(5) the curative inadmissible evidence is of the same character as the previously admitted inadmissible evidence; and

(6) the probative value of the otherwise inadmissible curative evidence outweighs the danger of "confusion of the issue or misleading the jury or by considerations of undue delay, waste of time, [etc.]." *See* Fed.R.Evid. 403.

Basically, these rules can be distilled into a rather simple maxim which can be characterized by McCormick's cliche "fighting fire with fire." John W. Strong, *McCormick on Evidence* § 57, at 229 (4th ed. 1992). Litigants have a limited right to contain trial fires which they had no part in starting by using defensive fires of the same size and character if, by doing so, they will not damage any other aspects of the trial.

Where, as in the instant case, an adverse witness gives an unresponsive, unanticipated prejudicial answer to a question, the issue is whether the admission of rebutting evidence is controlled by the "opening the door" rules of expanded relevancy or by the more limited rules of curative admissibility. The answer depends on the character of the responsive evidence sought to be admitted. If the proffered responsive evidence is competent evidence that would otherwise be admissible if relevant, then it is tested only by the rules of relevancy (the "open door" rules). The trial judge must simply ask whether the proffered responsive evidence is made relevant by the unanticipated answer. If the proffered responsive evidence would be incompetent (*e.g.,* hearsay) regard-

less of its relevance, then it is only admissible if permitted by the principles of curative admissibility we have outlined above.

■ When Officer Winder testified that Clark had been implicated as a suspect in another rape, the evidence came in with no opportunity to object, and Clark's counsel sought to neutralize the officer's testimony. If Clark's counsel had merely asked "But isn't it true *you* no longer consider Clark a suspect," the answer he was soliciting would have been made relevant by the officer's inadvertently admitted "blurt," and would have implicated traditional "open door" principles. But because Clark's counterattack consisted of otherwise irrelevant *and* incompetent hearsay DNA evidence, such evidence should only have been admitted, if at all, under the "curative admissibility" doctrine.

There are important reasons why application of curative admissibility was particularly appropriate in this case. Without prior knowledge of the witness's role in the other rape investigation, Clark's counsel did not strategically seek, nor could she reasonably have anticipated, the officer's "blurt" that Clark was implicated in another rape. Once elicited, however, the damage to Clark's case cannot be overstated. In fact, Officer Winder's unresponsive statement may have been sufficiently prejudicial to justify a mistrial. *Cf. Rainville v. State,* 328 Md. 398, 411, 614 A.2d 949, 954–55 (1992); *Kosmas,* 316 Md. at 597–98, 560 A.2d at 1141–42; *Guesfeird v. State,* 300 Md. 653, 659, 480 A.2d 800, 803 (1984). In lieu of asking for a mistrial, Clark instead sought to neutralize the prejudice by seeking evidence from the same witness, which was of the same character and scope as the original inadmissible evidence and which neither aided Clark's case nor damaged the State's case beyond the neutralization. Given these unique circumstances, once Clark's counsel inadvertently elicited the incriminating evidence, she should have been afforded this limited "curative admissibility" to mitigate the evidence's damaging impact.

We must emphasize that we would be far less willing to permit Clark such a remedy if the record indicated (1) that

defense counsel had intentionally solicited the evidence of the other rape and then failed to object on tactical grounds, hoping to elicit the scientific rebuttal evidence, or (2) that she had so carelessly phrased the question that an opportunity to combat the answer would be undeserved and inappropriate. Neither circumstance exists here. As we have said above, there is no indication that Clark's counsel did anticipate, or could have anticipated, Officer Winder's highly prejudicial answer to her innocuous question.

Rarely will a trial judge be reversed for not applying curative admissibility. However, the peculiar facts of this case compel application of this very narrow doctrine. We believe the trial judge erred in failing to permit Clark to bring out the officer's knowledge of the DNA results which established Clark was no longer a suspect in the other rape. The officer's other rape testimony, left unrebutted, could certainly have undermined the jury's ability to fairly decide this case. Therefore, we must reverse his conviction and remand for a new trial.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY, AND TO REMAND THE CASE TO THAT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.